[Cite as *State v. Sales-Hilton*, 2012-Ohio-5651.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No.    26351 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| LATAYA SALES-HILTON | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No.    CR 11 07 1765 |

DECISION AND JOURNAL ENTRY

Dated: December 5, 2012

WHITMORE, Presiding Judge.

{¶1} Defendant-Appellant, Lataya Sales-Hilton ("Hilton"), appeals from her convictions in the Summit County Court of Common Pleas. This Court reverses.

I

{¶2} Hilton and Cameron Murray had been dating for approximately four years and would often spend nights together. According to Murray, he arrived at their apartment one morning in July to find Hilton cutting his clothing with scissors. Murray testified that Hilton was angry with him because he had stayed out all night. The two argued, and Murray grabbed Hilton in an effort to stop her from cutting his clothing and to remove her from the room. Hilton attempted to push Murray away and the two wrestled, causing them to fall to the floor. During this fight, Murray sustained cuts and puncture wounds to his chest, arm, back, and leg. Murray said that he was not aware of his injuries until he went downstairs and a roommate told him that

he was bleeding. After the roommate bandaged him, Murray left the house and called his mother to come pick him up.

{¶3} When Murray's mother arrived and saw his injuries, she called the police over his objections. The police and the paramedics responded to the scene. Murray was uncooperative and maintained that he did not want the police involved.

{¶4} Hilton was charged with (1) felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second degree, (2) domestic violence in violation of R.C. 2919.25(A), a misdemeanor of the first degree, and (3) domestic violence in violation of R.C. 2919.25(C), a misdemeanor of the fourth degree. The court issued a protection order prohibiting Hilton from having any contact with Murray. According to Murray's mother, she subsequently found Hilton and Murray in bed together at her daughter's house, and Hilton was charged with violating a protection order in violation of R.C. 2919.27, a misdemeanor of the first degree.

Jury Empanelment

{¶5} The court conducted voir dire on Thursday, January 5, 2012. Several of the petit jurors informed the court that they were available the next couple of days, but had schedule conflicts with Monday. The court inquired as to whether the case might carry over until Monday, to which the prosecutor responded, "for deliberations, possibly." The court then responded with promises that the trial would not carry over into Monday. Several prospective jurors again expressed a concern about Monday, including Juror McBee who said, "I can't miss [any classes] at all. I'm in a doctoral program * * *." The court then said, "Well, you know what we're going to do, we're going to finish this by tomorrow, there is no question." Out of the prospective jurors that had informed the court of a scheduling conflict with Monday morning, McBee was the only one empaneled.

{¶6}    After the jury selection was complete, the court informed the attorneys that they could not be in the courthouse late on Friday, and therefore, they should try the case in an expeditious manner.  The court further informed the jury that, due to the judge's personal schedule, the proceedings would adjourn at 3:30 p.m. on Thursday and begin again at 9 a.m. on Friday.

Jury Instructions & Removal

{¶7}    The jury returned to the courtroom the following morning and the trial proceeded.  Prior to lunch, after all of the testimony had been heard, the court passed out copies of the jury instructions to the members of the jury and asked that they follow along as the court read them aloud.  After reading the instructions, the court released the two alternate jurors.  Sometime thereafter, the court realized it had omitted reading one paragraph of the instructions.  The court proceeded to read this portion of the instructions to the jury, on the record, in the jury room.

{¶8}    After several hours of deliberations, the jury sent a question to the court inquiring what it should do if it could not reach a verdict on two of the counts.  The court issued a *Howard* charge and ordered the jury to continue deliberations.  However, because of the late hour, the court dismissed the jury for the weekend.  Juror McBee then reminded the court that she could not return to court on Monday.  After a very brief exchange between the court and McBee, McBee confirmed that she would not return on Monday.  The court then replaced McBee with the first alternate.

Deliberations of New Jury

{¶9}    The following Monday, the 11 original jurors and first alternate returned to the courtroom.  The court asked the foreman if it was his opinion that he could begin deliberations anew and gave the jury four new, blank verdict forms.  After several hours, the jury submitted a

question to the court indicating that the jury was at an impasse on one of the four counts. Over objections by the State and Hilton, the court issued *Howard* and *Allen* charges and accepted the partial verdict.

{¶10} The jury found Hilton guilty of felonious assault and violating a protection order and not guilty of one domestic violence charge. The jury did not reach a verdict on the remaining domestic violence charge, and the court granted the State's motion to dismiss that count. Hilton now appeals from her convictions and raises four assignments of error for our review. To facilitate the analysis, we rearrange and consolidate some of the assignments of error.

## II

### Assignment of Error Number One

THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY IMPROPERLY IMPANELING AN ALTERNATE JUROR AFTER THE JURY HAD BEGUN THEIR DELIBERATIONS AND REACHED A PARTIAL VERDICT, THEREBY DENYING APPELLANT HER CONSTITUTIONAL RIGHT TO A FAIR AND IMPARTIAL JURY DELIBERATION AND/OR JURY TRIAL IN VIOLATION OF THE U.S. CONSTITUTION AND THE OHIO CONSTITUTION.

{¶11} In her first assignment of error, Hilton argues that she was denied her right to a fair trial when the court replaced an original juror with an alternate juror after deliberations had begun and a partial verdict had been reached. Specifically, Hilton argues that the court's decision to replace the original juror was both contrary to law and an abuse of discretion because "there was no 'manifest necessity' to replace the original juror."

{¶12} R.C. 2945.29 permits a court to replace a juror with an alternate "[i]f, before the conclusion of the trial, [the original] juror becomes sick, or for other reason is unable to perform his duty * * *." As of 2008, Crim.R. 24(G)(1) allows the court to replace a juror after

deliberations have begun. However, "[i]f an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew." Crim.R. 24(G)(1).

{¶13} "This Court reviews the trial court's decision to remove a juror for an abuse of discretion." *State v. Veal*, 9th Dist. No. 26005, 2012-Ohio-3555, ¶ 32. An abuse of discretion means that the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). In addition to an abuse of discretion, Hilton must show that she was prejudiced by the court's action. "Absent a record showing that the court abused [its] discretion which resulted in prejudice to the defense, the regularity of the proceedings is presumed." *State v. Brown*, 2d Dist. No. 24541, 2012-Ohio-1848, ¶ 46.

{¶14} Late Friday afternoon, the jury submitted a question to the court asking "[w]hat [they] should [] do if [they] [we]re 'hung' on two count[s]." The court provided a *Howard* charge and decided to conclude deliberations for the day. The court asked the jury to decide when they wanted to return on Monday morning. While several jurors expressed the desire to continue deliberating in an effort to conclude the case that day, the court said that the courthouse must be vacated no later than 5 p.m., and therefore, deliberations must be resumed on Monday. Juror McBee then reminded the court that she could not return on Monday because her doctorate program was scheduled to begin. The court had a brief discussion with the juror and confirmed that she *would not* return to the courthouse on Monday. The court decided to replace Juror McBee with the first alternate, and Hilton filed a written objection.

{¶15} Hilton argues that the court erred in replacing McBee because there was no "manifest necessity" to do so. Hilton fails to point us to any case law in which "manifest necessity" is the standard by which the court must determine whether to replace a juror. *See State v. Hopkins*, 27 Ohio App.3d 196, 198 (11th Dist.1985) (manifest necessity is required to

dismiss entire jury and declare mistrial, but is not the standard to replace one juror with an alternate). The crux of Hilton's argument is that the juror's excuse for why she could not return on Monday was insufficient to warrant a discharge of her duties. However, Hilton overlooks Juror McBee's clear refusal to return to court on Monday to continue deliberations. This left the court with little choice but to replace McBee with an alternate juror. The court's decision to replace the juror was an attempt to resolve the case in the most efficient manner and cannot be said to have been arbitrary, unreasonable, or unconscionable. *See Blakemore*, 5 Ohio St.3d at 219.

Beginning Deliberations Anew

**{¶16}** "If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew." Crim.R. 24(G)(1). "The purpose of such instruction is to negate any possibility of coercion or intimidation of the substitute juror." *State v. Elersic*, 11th Dist. Nos. 2000-L-062 & 2000-L-164, 2001 WL 1497192, *13, citing *State v. Miley*, 77 Ohio App.3d 786, 791-793 (12th Dist.1991). Despite Hilton's concession in her brief, the transcript is clear that the court did not issue the required instruction. "Normally, this Court would only consider issues that were raised on appeal; nonetheless, this Court does have discretion to sua sponte notice plain error." *State v. McPherson*, 9th Dist. No. 11CA0024-M, 2012-Ohio-859, ¶ 6.

**{¶17}** On Friday afternoon, the original jury reached verdicts on two of the counts and asked the court "[w]hat [they] should [] do if [they] [we]re 'hung' on two count[s]." The jury did not indicate which charges were resolved or what their verdicts were. The court responded with a *Howard* charge and ordered the jury to continue deliberations on Monday. After Juror McBee said that she would not return on Monday, the court replaced her with an alternate juror.

One of the other jurors then asked the court if they would have to start deliberations all over, to which the court responded, "Yes, start all over on * * * all four of the counts, that's correct."

{¶18} On Monday morning, 11 of the original jurors plus the first alternate arrived in court. The court verified that the alternate juror had not discussed the case with anyone and had abided by the admonitions given, including not conducting any independent research. The court then asked the foreperson: "is it your opinion that you can begin deliberations anew on these four charges?" The foreman answered, "Yes." This was the only time in which the trial court addressed the issue of beginning deliberations anew in the presence of the alternate juror.

{¶19} While the court did order Friday's verdict forms to be shredded and did give the jury four new verdict forms, it, at no point, instructed the jury, with the alternate juror present, that it *must* begin deliberations anew. We decline to presume that the jury understood that it must begin deliberations anew from the court's question to the foreman about whether, in his opinion, he *could* begin deliberations anew. Under the circumstances of this case, the possibility of prejudice was so great that Hilton was effectively denied her right to a fair jury trial. The court's failure to issue the instruction that the jury must begin deliberations anew is reversible, plain error. *See Elersic* at *13.

{¶20} The court further erred in failing to read the complete jury instructions to the alternate juror. Twelve jurors and two alternates were sworn in on Thursday morning, February 5, 2012. On Friday, the court read the instructions to the jury and then dismissed the alternate jurors. Subsequently, the court realized it had skipped a portion of the jury instructions and went to the jury room to read, on the record, the omitted language, which stated as follows:

> You may not discuss or consider the subject of punishment. In the event you find the Defendant guilty, the duty to determine the punishment is placed, by law, upon the [c]ourt.

The court did not read these instructions to the alternate juror on Monday when it replaced the original juror. We do note, however, that the jurors were given printed copies of the complete instructions, and that during voir dire the prosecutor had mentioned that the jurors were not to consider the subject of punishment.

{¶21} Because we reverse on the court's failure to properly instruct the jury to begin deliberations anew, we need not reach the issue of whether the court's failure to read the entire instructions to the alternate juror actually deprived Hilton of her constitutional right to a fair trial.

{¶22} Hilton's first assignment of error is overruled, but her convictions are reversed because the court committed plain error in failing to instruct the jury to begin deliberations anew.

Assignment of Error Number Four

THE TRIAL COURT ERRED IN DENYING APPELLANT'S CRIMINAL RULE 29 MOTION FOR ACQUITTAL.

{¶23} In her fourth assignment of error, Hilton argues that the court erred in denying her Crim.R. 29 motion for acquittal because the State presented insufficient evidence to support her convictions for felonious assault and violation of a protection order. We disagree.

{¶24} Hilton's fourth assignment of error is not rendered moot by our conclusion to reverse the matter because of a trial error. The Ohio Supreme Court has "distinguish[ed] between appellate court reversals based solely upon insufficiency of the evidence and those based on ordinary 'trial errors.'" *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, ¶ 18.

> The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution protect a criminal defendant from multiple prosecutions for a single offense. Accordingly, notwithstanding some procedural defect by the trial court warranting reversal, the state remains entitled to "one, and only one, full and fair opportunity" to prosecute the defendant in regard to a single offense.

*State v. Vanni*, 182 Ohio App.3d 505, 2009-Ohio-2295, ¶ 14 (9th Dist.), quoting *Richardson v. United States*, 468 U.S. 317, 330 (1984). Therefore, the Double Jeopardy Clause does not prevent a retrial of a case that was reversed based on trial error, provided the State presented sufficient evidence to sustain a guilty verdict. *Brewer* at ¶ 17.

{¶25} "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386. When reviewing a conviction for sufficiency, evidence must be viewed in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The pertinent question is whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*.

{¶26} "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Thompkins* at 386, citing *State v. Robinson*, 162 Ohio St. 486 (1955). This Court, therefore, reviews questions of sufficiency de novo. *State v. Salupo*, 177 Ohio App.3d 354, 2008-Ohio-3721, ¶ 4 (9th Dist.).

Felonious Assault

{¶27} A person is guilty of felonious assault if he or she knowingly causes or attempts to cause physical harm to another by means of a deadly weapon. R.C. 2903.11(A)(2). "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). A "'[d]eadly

weapon' means any instrument, device, or thing capable of inflicting death * * *." R.C. 2923.11(A).

{¶28} Hilton does not make any argument that scissors fail to meet the definition of a deadly weapon. *See* App.R. 16(A)(7). This Court has repeatedly held, "[i]f an argument exists that can support [an] assignment of error, it is not this [C]ourt's duty to root it out." *Cardone v. Cardone*, 9th Dist. No. 18349, 1998 WL 224934, *8 (May 6, 1998). Therefore, we limit our review to the element of knowingly.

{¶29} Officer Ronald Kennedy, an Akron Police Officer who responded to the scene, testified that Hilton told him that she grabbed scissors to defend herself and that Murray ran into the scissors several times. However, Officer Kennedy attested that Murray's injuries "didn't appear to be * * * defensive wounds," explaining that if Hilton was trying to defend herself, he would have expected Murray's wounds to be "in one specific area of the body, [] not up and down one side." Officer Kennedy further testified that he was surprised at how calm Hilton was and that in his experience victims are usually more emotional.

{¶30} Detective John Bell also spoke to Hilton at the scene. Hilton told Detective Bell that she became very upset when Murray arrived home that morning. She had retrieved a pair of scissors from a drawer in the hallway, returned to the room, and began cutting his clothing. Murray had grabbed her in an effort to stop her from cutting his clothing, but she was able to pull away. They argued for approximately 20 minutes and, at some point, she threw the scissors causing the blades to break apart. Hilton said she picked up half of the broken scissors and the two continued to argue. Murray grabbed Hilton again, trying to calm her down, and the two struggled, wrestling to the floor. At some point thereafter, they realized Murray was bleeding

and the fight stopped. Hilton told Detective Bell that Murray was pretty upset and could not believe that she had stabbed him.

{¶31} Heather Greathouse rented a room in the home in which the incident occurred. Greathouse was downstairs with her mother when Murray arrived that morning. When she was interviewed by the police, Greathouse said she saw Hilton cut Murray with the scissors. However, at trial, Greathouse testified that she did not witness the incident, but instead remained downstairs and was not aware of any trouble until Murray came downstairs bleeding. Greathouse bandaged Murray's wounds, and he left. When asked why her testimony was inconsistent with her statements given to the police, she said that right after the incident she was "shook[] up" and "just wanted [the police] to leave."

{¶32} Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of felonious assault were proven beyond a reasonable doubt. *See Jenks*, 61 Ohio St.3d at paragraph two of the syllabus. The only witnesses to the incident were Murray, Hilton, and Greathouse. The statements made to the police and the testimony at trial allow for the conclusion that Hilton picked up the broken scissors with the intention of keeping Murray from removing her from the room. Moreover, Hilton was aware that she was holding the broken scissors when she began wrestling with Murray, and Officer Kennedy testified that Murray's injuries were inconsistent with Hilton's version that she was trying to defend herself. The State was not required to prove that Hilton had the intention of causing harm, it was merely required to prove that Hilton was aware that her conduct would probably cause a certain result. Thus, the State presented sufficient evidence to support all of the elements of felonious assault, and the court did not err in denying Hilton's motion for acquittal on this charge.

Violation of Protection Order

{¶33} A person is guilty of violating a protection order if he or she "recklessly violate[s] the terms of * * * a protection order issued * * * pursuant to [a charge of domestic violence] * * *." R.C. 2919.27(A)(1). "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C).

{¶34} The court issued a temporary criminal protection order, pursuant to R.C. 2919.26, on July 5, 2011. Cassandra Murray, Cameron Murray's mother, testified that she was in court with her son when the court informed Hilton that the protection order was in effect. Cameron Murray also testified that he was present when the protection order was put into effect and understood that it prohibited Hilton from having any contact with him.

{¶35} Mrs. Murray testified that on August 31, 2011, after the protection order had been in place for nearly two months, she arrived at her daughter's house and discovered Hilton and Murray in bed together. Mrs. Murray called the police, but testified that Hilton left before they arrived. Cameron Murray testified that Hilton was not there that morning and that his mother called the police because the two of them were fighting.

{¶36} Viewing the evidence in a light most favorable to the prosecution, a reasonable juror could have concluded that Hilton was aware of the protection order and was with Murray that August morning. Thus, the State presented sufficient evidence to support the conclusion that Hilton had violated the protection order, and the court did not err in denying her motion for acquittal. Accordingly, Hilton's fourth assignment of error is overruled.

## Assignment of Error Number Two

THE TRIAL COURT COMMITTED PLAIN ERROR IN THE HANDLING OF ITS JURY PROCEDURE, THEREBY DENYING APPELLANT HER CONSTITUTIONAL RIGHT TO A FAIR AND IMPARTIAL JURY DELIBERATION AND/OR JURY TRIAL IN VIOLATION OF THE U.S. CONSTITUTION AND THE OHIO CONSTITUTION.

## Assignment of Error Number Three

THE TRIAL COURT'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶37}** Hilton's second and third assignments of error are rendered moot by our conclusion to reverse the matter because of a trial error. We, therefore, decline to address them. *See* App.R. 12(A)(1)(c).

## III

**{¶38}** Hilton's convictions are reversed because the court failed to instruct the jury to begin deliberations anew when replacing a juror after deliberations had begun. Hilton's first and fourth assignments of error are overruled, and her remaining assignments of error are moot. The judgment of the Summit County Court of Common Pleas is reversed, and the cause is remanded for further proceedings consistent with the foregoing opinion.

Judgment reversed,
and cause remanded.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

 

 

 

                                     _____

                                     BETH WHITMORE
                                     FOR THE COURT

 

 

MOORE, J.
CARR, J.
CONCUR.

 

APPEARANCES:

JAMES K. REED, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.